AUSA LIFE INSURANCE COMPANY,
et al., Plaintiffs,

v.

ERNST & YOUNG, Defendant.

94 Civ. 3116(WCC).

United States District Court,
S.D. New York.

Dec. 5, 1997.

As Amended Dec. 19, 1997 nunc
pro tunc Dec. 5, 1997.

See also: 928 F.Supp. 1239.

Cadwalader, Wickersham & Taft, New York City (Debra Brown Steinberg, Edwin David Robertson, of counsel), for Plaintiffs.

Mayer, Brown & Platt, Chicago, IL (Alan N. Salpeter, Howard J. Roin, Caryn Jacobs, Bradley J. Andreozzi, Brian Massengill, Linda T. Coberly, of counsel), Schulte Roth & Zabel L.L.P., New York City (Howard O. Godnick, of counsel), Ernst & Young L.L.P., General Counsel's Office New York City (Patricia A. Connell, of counsel), for Defendant.

### OPINION AND ORDER

WILLIAM C. CONNER, Senior District Judge.

This is one of a group of 22 actions brought by investors in the securities of JWP, Inc. in an attempt to recoup their losses on such investments. Nineteen separate actions brought by those who purchased the common stock of JWP were consolidated into a single action captioned *In re JWP, Inc. Securities Litigation*, 92 Civ. 5815(WCC). The plaintiffs in the consolidated action filed a joint class action complaint and the Court certified a plaintiff class consisting of all those who purchased JWP common stock in the open market between May 1, 1991 and October 2, 1992. After extensive discovery and lengthy negotiations, the class action was settled, along with a twentieth action, *Melvin S. Aronoff, et al. v. Andrew Dwyer*, et al., 94 Civ. 2201(WCC), brought by the owners of a business which they sold to JWP in exchange, *inter alia*, for JWP common stock. The two remaining actions were brought by a group of nine U.S. and Canadian insurance companies who had purchased long-term

notes of JWP in a series of private placements. One of these two actions, *AUSA Life Insurance Company, et al. v. Andrew T. Dwyer,* et al., 94 Civ. 2201(WCC), was brought against the officers and directors of JWP who allegedly manipulated the financial statements of the company to grossly overstate its net worth and earnings and create a false picture of financial strength and earnings prospects. That action is awaiting trial.

The present action, the last of the group of 22, was brought against Ernst & Young ("E&Y"), the "Big 6" accounting firm which served as independent auditor for JWP from 1985 through the completion of its audit of JWP's consolidated annual report for 1992, spanning the entire period of the alleged fraudulent activity. Plaintiffs assert claims against E&Y under Section 10(b) of the Securities and Exchange Act of 1934, 15 U.S.C. Sec. 78j(b), and for common law fraud and negligent misrepresentation, alleging that E&Y either conspired with JWP's executives in the perpetration of the fraud or, having discovered it, deliberately suppressed the information, or were reckless in the conduct of their audits and thereby failed to discover accounting irregularities that would have been discovered in audits conducted in accordance with generally accepted auditing standards ("GAAS"). The action was tried without a jury over an eleven-week period from April to July, 1997 and post-trial briefs and proposed findings and conclusions were submitted thereafter by the parties. This Opinion will briefly summarize the Court's decision, which is more fully detailed in the separate Findings of Fact which follow.

## BACKGROUND

In the early 1980's, JWP was a relatively small company whose business consisted primarily of operating a regulated water utility on Long Island, New York. Between 1984 and 1992, JWP expanded aggressively and rapidly by acquiring some 100 companies, mostly in the fields of mechanical and electrical engineering and construction, energy and environmental systems and computer sales and services. These acquisitions increased the company's revenues to roughly 100 times their early 1980's levels. They were financed primarily by private placements of debt securities, which placed JWP in a highly leveraged and recession-sensitive financial position.

The nine insurance companies who are plaintiffs in this action purchased a total of $149 million of JWP's notes between November 15, 1988 and March 6, 1992. These purchases were made in reliance on JWP's past financial statements, including its annual reports certified by E&Y, and involved Note Agreements which required that JWP's books be kept in accordance with generally accepted accounting principles ("GAAP") and that at the time of each annual audit JWP's independent auditors (E&Y) furnish to JWP for transmittal to the noteholders a letter (which plaintiffs call a "no-default certificate," while defendant prefers the term "negative assurance letter") stating that it has audited JWP's financial statements according to GAAS and that "nothing has come to our attention that caused us believe that the company has failed to comply with the terms *** of the Note Agreement."

JWP's final acquisition was by far its largest (in terms of revenues) and riskiest. In late 1991, it purchased Businessland, Inc. ("Businessland"), a retailer of computers and supplier of software and related services. Businessland was in serious financial trouble, having lost an average of ten million dollars a month over the previous ten months, and its auditors (not E&Y) had issued a "going concern" qualification on Businessland's most recent audited financial statements, indicating their doubt as to the company's ability to survive. However, JWP's executives believed they could turn the company around by converting it from a "box pusher" reselling computer hardware into a higher-margin "value-added" systems integrator supplying to large corporate clients their full computer needs, including networking setups, tailormade software, instruction and servicing. They saw in Businessland's existing clientele of Fortune 1000 companies and trained sales force the nucleus of a potentially dynamic and profitable organization which would mesh well with their successful electrical contracting business, already heavily involved in the installation of wiring for complex corporate computer networks.

Businessland was a massive bite for JWP to swallow, its 1990 revenues of $1.3 billion increasing JWP's total revenues by 45%. And JWP was immediately faced with the burden of advancing funds to Businessland to meet its operating expenses. The planned closure of most of Businessland's retail stores took longer and cost more than anticipated. Moreover, the acquisition coincided with a period of intense competition in computer sales, commonly referred to as the "PC price wars." This factor, in combination with a downward trend in office construction adversely affecting the electrical construction divisions of JWP, resulted in substantial losses.

Although JWP's annual report for 1991, audited and certified by E&Y, showed revenue of $3.6 billion, after-tax profit of $60.3 million and net worth of $496 million, after the Businessland acquisition there was reason to question the company's financial health and prospects. In early 1992, David Sokol was brought in as JWP's President and Chief Operating Officer. He soon discovered what appeared to be a number of serious accounting irregularities. In August 1992, at Sokol's direction, JWP retained another "Big Six" accounting firm, Deloitte & Touche, to conduct a thorough review of the company's books and E&Y's audits. They concluded, and E&Y concurred, that JWP's annual reports for 1990–1992 should be restated to reduce 1990 after-tax net income by 15% (from $59 to $50 million) and 1991 after-tax net income by 52% (from $60 to $29 million) and to reflect a 1992 *loss* of $612 million and net worth of *minus* $176 million.

JWP continued to pay all of the interest due on its notes through 1992, and made partial payments through April 1993, but ultimately defaulted and was placed in involuntary bankruptcy on December 21, 1993. All of the plaintiffs except Prudential sold all of their notes at deep discounts in 1993 and 1994. Prudential sold part of its notes at a loss and in the bankruptcy reorganization exchanged the remainder for cash and securities of substantially lesser total value than the face amount of the notes. In principal and unpaid interest, plaintiffs thus lost a total of approximately $100 million.

**PLAINTIFFS' CLAIMS**

Plaintiffs contend that although E&Y issued clean audit reports certifying the year-end financial statements of JWP as well as the annual no-default letters, on all of which plaintiffs relied in purchasing JWP's notes, E&Y's audits fell far short of the requirements of GAAS and were negligent to the point of recklessness, particularly in failing to report its discoveries that JWP's accounting had overstated net income through many violations of GAAP, including:

1. In accounting for its corporate acquisitions, JWP used the "purchase" method, but repeatedly violated GAAP rules relating thereto by capitalizing as "goodwill" operating expenses improperly classified as acquisition costs, including costs incurred after the acquisition and beyond the one-year "window" allowed by GAAP.

2. JWP arbitrarily wrote up the inventory of small tools of several of its acquired subsidiaries, offsetting this entry by creating "negative goodwill" which was amortized into net income and by creating a "general reserve" which was used to offset operating losses.

3. JWP set up in a "negative goodwill" account the anticipated tax benefits of the net operating loss ("NOL") carryforwards of its acquired companies, without satisfying GAAP and SEC requirements concerning such treatment, and amortized this account to increase reported net income.

4. JWP improperly capitalized the costs of unproven software for internal use.

5. JWP concealed construction contract losses by recording baseless claims.

6. JWP failed to establish reserves for receivables of dubious collectibility.

**E&Y's DEFENSES**

In addition to contending that plaintiffs have not proven the necessary elements of their claims of fraud and negligent misrepresentation, E&Y asserts a number of affirmative or special defenses:

(1) that the claims under Section 10(b) are barred by the Statute of Limitations;

(2) that plaintiffs have no claim against E&Y for negligent misrepresentation because there was no relationship approaching privity between them; and

(3) that JWP's insolvency and plaintiffs' resulting losses were caused not by falsity in JWP's financial statements but by the downturn in commercial construction, by JWP's catastrophic acquisition of the failing Businessland and the ensuing PC price wars.

## DISCUSSION

It is only natural for one who has suffered an injury or financial loss to seek legal redress from those who caused it and, if those primarily responsible have insufficient resources for full restitution, to pursue others less directly involved to make up the deficiency. In the present case, the insurance company lenders lost roughly $100 million on their purchases of JWP's notes. These purchases were made in reliance upon JWP's annual reports audited by E&Y and on E&Y's no-default letters for the preceding years. Following their review, Deloitte & Touche concluded, and E&Y conceded, that the annual reports were incorrect in many significant respects.

During settlement discussions, it became apparent that the officers of JWP responsible for the improper accounting practices, even if they are proven guilty of fraud, are substantially judgment-proof, with reachable assets sufficient to cover only a tiny fraction of plaintiffs' losses, even without considering the hundreds of millions of dollars in claims filed by those who purchased JWP's common stock in reliance on JWP's misleading financial statements. JWP had three layers of directors and of fleets ("D & O") liability insurance covering claims against these officials (excepting claims for intentional deception) up to a total of $50 million. But these policies covered defense costs as well as damages, and each of these individual defendants had his own separate attorney so that almost half of the total D & O coverage was consumed by defense costs during the extensive discovery and motion proceedings. Settlement of the stockholders' actions consumed much of the remainder of the D & O coverage. Thus the insurance companies who pur-

chased JWP's notes are left with the prospect of recovering no more than a small fraction of their losses in their action against the directors and officers, an action which will almost surely be settled, for otherwise the defense costs could be expected to eat up virtually all of the remaining D & O coverage. The present action against the presumed "deep pocket" accounting firm which audited and certified JWP's annual reports and issued the accompanying "no default" letters is thus the insurance company plaintiffs' main chance for reimbursement of their substantial losses.

## PLAINTIFFS' SECTION 10(b) CLAIMS

To recover against E&Y on their claims under Section 10(b), plaintiffs must prove (1) that JWP's annual reports and/or E&Y's annual no-default letters were false in material respects; (2) that in certifying the annual reports and/or in issuing the no-default letters E&Y acted with scienter—that is, with actual knowledge of their material falsity and an intent to deceive investors or with such recklessness that an intent to deceive may be inferred; (3) that plaintiffs relied on the annual reports and/or the no-default letters in deciding to purchase JWP's notes; and (4) that defendants suffered losses as a result of such reliance. *Bloor v. Carro, Spanbock, Londin, Rodman & Fass,* 754 F.2d 57, 61 (2d Cir.1985).

### Falsity

The evidence clearly showed that JWP's audited annual reports for each of the years 1987 through 1992 contained material errors and that E&Y's annual no-default letters falsely attested that E&Y had discovered no violation of the Note Agreements, which required that JWP's books be kept in accordance with GAAP.

### Acquisition accounting abuses.

Among the errors which were found were a number of violations of GAAP rules for treating the acquisition of subsidiaries. When the acquiring company pays more than the book value or appraised value of the net worth of the acquired company, the excess is considered as a payment for the "goodwill" of the acquired company, and is written up as

an asset which is amortized as a reduction of net income of the acquiring company over a 40–year period. When the purchase price is less than the book value or appraised value, the difference is treated as "negative goodwill" and is amortized to increase net income over a "reasonable"—but much shorter—period, usually five to seven years.

JWP used the "purchase accounting" method of recording its acquisitions of subsidiaries, but repeatedly failed to follow the GAAP standards applicable thereto. When JWP acquired Forest Electric in 1986, it was forced to sell another subsidiary, Lehr Construction Co. in order to avoid a conflict of interest between the executives of Forest and Lehr. Lehr was sold at a substantial loss, but JWP decided that the loss should not be taken as a reduction of current net income but considered part of Forest's acquisition cost, capitalized as "goodwill" of Forest, and amortized over 40 years. E&Y deemed this treatment "reasonable." But in 1988, when JWP paid $875,000 to Lehr, JWP also treated this as an additional acquisition cost, although it was beyond the one-year "window" to which GAAP limits the recognition of acquisition costs. Thus it would be amortized over 40 years instead of being taken as a reduction of 1988 income. E&Y objected to this violation, but ultimately decided it was "immaterial" and issued a clean 1988 audit report.

When JWP acquired Kerby–Saunders–Warkol ("KSW") in 1987, E&Y found that KSW had failed to disclose certain contingent liabilities and thereby concealed $1.25 million in losses. JWP looked to the former owners for reimbursement and treated this amount as a "contingent receivable." Because GAAP expressly prohibits the recognition of contingent assets, JWP falsely recorded it as a "note receivable." E&Y discovered this violation, but John LaBarca, its partner in charge of the JWP audit, approved it on the dubious ground that "there is no P & L effect" and because, if the "note" is uncollectible, the net worth of KSW would be reduced by $1.25 million, which could be capitalized as goodwill and amortized over 40 years.

In its audit of JWP's 1988 annual report, E&Y discovered that in three other acquisitions, JWP had incurred costs totaling $1.275 million outside GAAP's one-year window, but had nevertheless capitalized them as goodwill. E&Y included these items in its 1988 Summary of Audit Differences and suggested to JWP that the costs must be taken to reduce 1988 net income. This was not done but again E&Y decided the errors were not so substantial as to require an exception to its 1988 audit report.

In its 1989 acquisition of Drake & Scull, a UK construction company, JWP wrote off $4.2 million which Olympia & York, a major Drake & Scull customer, owed to JWP's subsidiary Forest Electric, and which was of questionable collectibility. Of course if the debt was uncollectible, the write-off should have been taken as a reduction of net income in 1989, rather than being capitalized as part of the acquisition cost. E&Y's John LaBarca questioned JWP's Chief Financial Officer, Ernest Grendi, about the matter and they reached an agreement to treat $2 million of the debt as collectible and thus part of the acquisition cost. During E&Y's 1989 audit, it decided that this agreement violated the GAAP rule against treating the disposition of assets of the acquiring company as a cost of acquisition. LaBarca accordingly proposed to Ernest Grendi that the still uncollected entire amount of $4 million be taken to reduce 1989 net income. Grendi declined to make such an adjustment. E&Y included this item in its 1989 Summary of Audit Differences, but relented and did not make it an exception to its 1989 audit report.

In its 1989 acquisition of Drake & Scull, JWP gave a former executive of the acquired company a consulting agreement which cost JWP $645,000 for services performed subsequent to the acquisition. Rather than treating this as a current expense, JWP capitalized it as a cost of acquisition. E&Y disapproved this treatment and included it in its 1989 Summary of Audit Differences. JWP refused to make the change, but E&Y nevertheless issued an unqualified 1989 audit report.

In March 1990, an unjustified bookkeeping entry was made at JWP's subsidiary Enviro–Gro, debiting the Patents asset account in the arbitrary amount of $678,000 and credit-

ing the Income account in the same amount. When questioned about it, JWP's Joseph Grendi admitted the entry was "baseless," adding that it was his time to be "creative." The obvious impropriety was corrected years later in the 1990 Restatement.

In June 1988 JWP acquired R & C and merged into another subsidiary Kornfeld. When R & C/Kornfeld suffered $4 million in losses on contracts, JWP treated it as an acquisition cost and capitalized it as goodwill in October 1990, two years after the R & C acquisition and beyond GAAP's one-year window. In its 1990 audit, E&Y discovered this violation, but believed the amount involved was only $1.4 million and therefore "immaterial." When it learned otherwise, it restated the 1990 (not the 1988) results.

## Arbitrary writeup of small-tool inventories.

From 1988 through 1991, JWP recorded small tool inventories based not upon a physical count but upon management's estimates. These estimates were purportedly arrived at by determining the ratio between the actual inventory of small tools at one of JWP's subsidiaries to the gross revenues of that subsidiary and applying that same ratio to the gross revenues of the other subsidiaries. Despite the fact that these entries were often made several years after the acquisition of the subsidiary and beyond the one-year window, the debit to the small tools account was offset by the creation of negative goodwill which was amortized to increase JWP's reported net income.

One particularly flagrant violation of GAAP occurred in 1990. JWP arbitrarily wrote up $10 million in small tools, offsetting the debit entry with a $5 million credit to negative goodwill and a $5 million credit to bad debt reserves. The negative goodwill was amortized to increase reported net income by $1.6 million in 1991 and $3.2 million in 1992. The general reserve for bad debts was used to offset losses on unidentified construction contracts in violation of GAAP.

E&Y was aware of these serious irregularities, but did not insist on their correction nor qualify its annual audit reports.

## Improper accounting for acquired net operating loss (NOL) carryforwards.

GAAP has strict rules governing the accounting treatment of NOL, carryforwards of acquired companies. The anticipated future tax benefits of such NOL carryforwards may be recorded at the time of acquisition as a reduction of the cost of acquisition only if the subsidiary in question is "virtually certain" to have sufficient future income to utilize the NOLs within the allowable carryforward period. If not, the NOL carryforwards may be recognized only as they are actually utilized to offset net income of the subsidiary and only to the extent of the resulting tax reduction. JWP repeatedly and flagrantly violated these rules.

Many of the companies acquired by JWP had NOL carryforwards but, except for its 1991 acquisition of Businessland, JWP did not record the NOLs at the time of acquisition. Instead, at the end of each year, it engaged in a bizarre "temporary" recognition of the NOLs in clear violation of GAAP. For the sole purpose of dressing up its year-end consolidated balance sheet, JWP made a bookkeeping entry debiting the deferred taxes account and crediting goodwill. The following day—the first business day of the new year—the entry was reversed. E&Y discovered this practice, but saw "nothing wrong" with thus recognizing the potential future tax benefits of the NOLs, notwithstanding the clear violation of GAAP rule APB11.

JWP further violated GAAP by the manner in which it treated the NOLs when they were utilized. GAAP forbids treating the NOLs so as to increase current net operating income because they are not current and they do not result from operation of the business. Instead GAAP requires that the amount of the tax benefit be deducted from goodwill and from non-current assets until those accounts are exhausted. If there is still an unused remainder of the tax benefit, it is set up as negative goodwill, which is amortized to increase net income over a reasonable period, usually five to seven years. JWP flouted these rules and not only put the amount of the tax benefit directly into negative goodwill but amortized it at a rate chosen to offset exactly the amortization of

positive goodwill—a rate which amounted to almost 50% per year! And it treated these effective additions as current operating income without the notation required by APB11 that the reported income included amortization of NOL tax benefits. E&Y discovered this abuse and informed JWP that the negative goodwill should be amortized systematically over a period of five to seven years. However, after talking with Ernest Grendi, E&Y's LaBarca decided that a three-year amortization of the tax benefits was "reasonable." But E&Y had miscalculated; actually, the amortization period was only about two years. Nevertheless, E&Y issued unqualified audit reports for the years in question.

There were more bizarre maneuvers in JWP's treatment of the acquired NOL carryforwards of two subsidiaries, BMC and Extel. Each had larger NOLs than income prospects, so they were merged into profitable JWP subsidiaries—BMC into Forest Electric in 1986 and Extel into Forest Datacom in 1987. In its 1986 tax return, JWP utilized part of BMC's NOL to offset current income and save $10.7 million in taxes and, in its 1987 return, JWP utilized part of Extel's NOL to save $8.2 million in taxes. Both times the tax savings were properly recorded as a reduction of goodwill. But in 1988, JWP undid this previous correct treatment by bookkeeping entries which restored the $18.9 million of negative goodwill and which were explained as a "reclassification" of the NOLs. This revived negative goodwill, instead of being offset against goodwill as required by GAAP, was amortized to increase net income in 1988 and thereafter, notwithstanding the fact that BMC was sold in 1988 and was no longer a part of JWP. In its audits, E&Y discovered this improper treatment, but took no exception to it.

**Improper capitalization of software costs.**

Starting in 1985, one of JWP's subsidiaries, Woodbury Computer Associates, expended $1.6 million in developing software for JWP's other subsidiaries. JWP capitalized these expenditures as made, in disregard of the GAAP rule that such costs cannot be capitalized until a determination has been made that the software is "technologically

feasible"—that is, until it has been proven to be useful—which did not occur until July 1987. E&Y's LaBarca called this irregularity to the attention of JWP's Ernest Grendi and proposed that an adjustment be made to the 1985 and 1986 financials to expense these development costs. But again Grendi stood firm and LaBarca backed down.

**Abuses in accounting for claims and receivables.**

GAAP (SOP 81–1) provides the proper procedure for recognizing interim revenues and profits on construction contracts which are uncompleted at the end of a fiscal period. The contract price is multiplied by the percentage of completion to determine the revenue earned to date, and from this the related costs are deducted to determine profit. In determining the percentage of completion, the costs to date may be divided by the estimated total cost to complete the job. However, if the total costs exceed the contract price, the entire estimated loss must be taken as an immediate deduction from earnings rather than being deferred until completion of the contract.

JWP had its own non-GAAP method of recognizing interim revenues and earnings, which effectively treated every contract as a "cost plus" contract. In bidding construction contracts, JWP's subsidiaries began with an estimate of their total costs and added 10% for overhead and 10% for profit (a compound increase of 21%). In determining interim profits, JWP assumed that its interim costs were on budget and multiplied its costs to date by 21% to determine its net profit to date. This of course ignored the possibility that costs were running above the original estimate and that the total cost of completing the contract might exceed the contract price and ultimately result in a loss. Since this procedure never resulted in forecasting a loss on the contract, it was impossible for JWP to comply with GAAP's requirement that anticipated contract losses been taken in full immediately. E&Y complained to JWP about the failure to provide estimates of the cost of completion, but never made this an exception to its audit reports.

JWP further violated GAAP in recording claims for "extra" work done on construction

contracts. Almost every construction job involves work which was not foreseen and included within the original contract specification, but which turns out to be necessary or desirable and which is added as an "extra" to the contract price. However if the work is done without a change order or other express authorization from the customer, the ability of the contractor to collect for the work is in doubt. GAAP requires conservatism in evaluating such claims and, in case of any doubt as to their collectibility, requires establishment of a reserve for doubtful claims and a reserve to cover legal fees and other costs of collection. JWP was anything but conservative in evaluating such claims and seldom established the required reserves. This of course resulted in overstatement of JWP's assets and earnings in the years in which the claims were recorded.

JWP did retain an outside consultant, CCS Associates, to evaluate such claims, but there is reason to believe they were picked for their unquenchable optimism as to collectibility. Indeed E&Y criticized some of their evaluations as "based on pure speculation." In its audits for 1987 to 1989, E&Y followed its own procedure for checking the collectibility of such claims by sending out to the customers requests for confirmation of the claims. But the response was so poor that E&Y discontinued the practice altogether in 1990.

The evidence does not establish the size of the reserves that should been established in 1990 and prior years. Plaintiffs' expert witness Dr. John Leslie Livingstone compiled a schedule which purported to show the claims and receivables which were uncollectible in 1990 and earlier years However his analysis was seriously flawed because he assumed that if a customer owed a certain amount in an earlier year and the same or a larger amount in a subsequent year the amount must have been uncollectible, ignoring the reality that most customers had a continual "rollover" in their accounts and may have paid several times the amount owed in the earlier year while incurring new obligations. Yet it is clear that JWP's assets and earnings were substantially overstated by its failure to set up reserves for uncollectible accounts and for the estimated costs of collection.

Indeed, JWP's track record in collecting such claims strongly suggests that many of them had been written up with little justification or hope of collection but merely to cover anticipated contract losses.

For example, in 1989 and 1990 Forest Electric recorded claims totalling $7.9 million on its Rikers Island job, without complying with the requirements of GAAP concerning the evaluation of such claims or establishment of a reserve to cover the estimated $1 million costs of collection. These claims include a loss of $1.5 million which Forest suffered in 1990 due to an underground methane gas fire at the job, but did not immediately recognize, as GAAP requires. These irregularities resulted in a substantial overstatement of JWP's earnings in 1989 and 1990.

By the end of 1989, Forest Electric had incurred $6,761,787 of costs on its $5,898,334 Rittenhouse contract—an apparent loss of almost $900,000. Instead of recognizing the entire loss immediately, as GAAP requires, JWP recorded only a $513,000 loss in 1989. In 1990, it recorded a claim of $1.25 million and thus was able to show a profit on the contract. The claim was never collected. JWP's own internal auditor Brian Aleksa determined that it had been improperly recorded and that the balance of the loss should have been taken as of December 31, 1990.

By the end of 1989, Forest had incurred $2,742,767 in costs on its $2,019,692 Norstar Bank contract—an apparent loss of $723,075. Instead of recognizing the entire loss, JWP wrote up a claim for $500,000 on the contract. It was never collected and was written off in 1992, but obviously should have been written off as of 1989.

By the end of 1990, Forest had incurred $20.8 million in costs on its $17.6 million Liberty Place contract. Instead of recognizing this $3.2 million loss in 1990, Forest wrote up a $3.5 million claim and showed a profit of $208,000 on the job. This without establishing a reserve for doubtful collectibility or a reserve to cover the estimated $1.5

million in legal costs necessary to collect the claim. By 1992, with the claim still in litigation, it had somehow doubled to $7 million. At that time, JWP finally set up a $3 million reserve on the claim. That was too little and too late. As of December 31, 1990, JWP's internal auditor Brian Aleksa had recommended a $6 million writeoff of the entire account.

By the end of 1990, Forest had expended $2,903,193 in costs on its $2,662,660 State House Capital contract—an apparent loss of $280,533. But, instead of recognizing this loss in 1990, JWP wrote up a claim for $650,000 and showed a profit of $116,128 on the job, thereby overstating 1990 net income by $396,661. However, as of October 1992, almost two years later, no such claim had ever been filed! Perhaps needless to say, it was never paid. At year end 1992, JWP took a $573,000 writeoff on the account. But an adjustment obviously should have been made as of 1990.

In 1984 one of Forest's divisions, Eastern States, which had a $5.2 million subcontract for electrical work on the Methodist Hospital job in Brooklyn, wrote up a $2 million claim for extras against the general contractor, Crow Construction Co. Six years later, in 1990, the claim was still in litigation, but was being carried on the books at full value, without even a reserve for the litigation costs. In 1991 Forest transferred the claim to another JWP subsidiary, Enviro–Gro, which had a contract with the City of New York to build a sludge pelletizer plant. JWP persuaded Crow to become the general contractor on the job with the hope, unsupported by any written agreement, that Crow would provide $2 million worth of its services without charge in satisfaction of the claim against it. This hope was extinguished in 1992 when Crow refused to submit an invoice to the City for the $2 million in services, and the claim was finally written off.

In its 1989 audit, E&Y discovered that JWP's subsidiary, Dynalectric Company of Nevada, had an apparent loss of $500,000 on its Rio Vegas Hotel and Casino contract, but had written up a claim of $200,000 and recognized only a net loss of $300,000. And in its 1990 audit, E&Y discovered a similar prac-

tice at Kirkwood/Dynalectric. It had an apparent loss of $800,000 on its Alhambra Bulk Mail contract, but had written up a $200,000 claim and recognized only a $600,000 loss. Neither of these claims was documented, and apparently neither was ever collected.

Apart from the irregularities in JWP's recording of claims for extras, JWP failed to set up adequate reserves for many accounts of dubious collectibility, even as the percentage of the charges to some customers which were unpaid for more than 120 days increased, in some cases to 100%, and even after the financial problems of some of the customers were widely publicized.

For example, in 1988, JWP sold one of its subsidiaries, ACP, back to the original owners, receiving as part of the consideration an agreement that ACP would give discounts up to a total of $5.5 million on sales to any JWP subsidiary before 1993. After using $1.4 million of the discounts in 1988, in its year-end statements, JWP wrote up the balance of potential future discounts as a $4 million receivable, in violation of the GAAP stricture against recognizing contingent assets. E&Y's Richard Stein questioned whether the balance of the credits would ever be used, but Ernest Grendi convinced him that they had "true value," and that, at worst, ACP would pay $3 million to buy off the obligation. Thus E&Y acquiesced in carrying the full $4 million on JWP's books as an unreserved account receivable.

As early as 1989, one of Forest's customers, NICO, had restructured its debt and was issuing non-interest-bearing IOU's to "pay" Forest's invoices. But it was not until 1991 that E&Y's LaBarca questioned Ernest Grendi about the collectibility of this account. Grendi managed to convince LaBarca that no reserve was required because he had a deal that would ultimately satisfy NICO's obligation through discounts given to JWP by a sister company of NICO. No such agreement was ever documented.

In its 1990 audit, E&Y discovered that JWP's subsidiary Dyn–Washington was carrying a $700,000 note receivable from one of its customers, Alan I. Kay. Although Kay had made no payment on the obligation for sever-

al years, JWP was carrying the note at full value. E&Y recommended that a reserve of $350,000 be set up in the 1990 financials. JWP declined to do so, but E&Y nevertheless issued a clean audit report. The receivable was finally written off in 1992.

As of December 31, 1990, another of Forest's customers, Herbert Construction, owed Forest $17.7 million, of which $5.7 million was over 120 days old, and at least $1.3 million of which was in dispute, being based on work done without obtaining the requisite purchase orders. E&Y was well aware of this situation and noted that Herbert was "returning [Forest's] invoices." Yet it was not until 1992 that JWP finally created a reserve of $2 million for this doubtful account.

In 1989, JWP West completed work on its $20 million Phoenician Hotel contract. A balance of $2 million was still unpaid over a year later. Even after the owner, Lincoln Savings, went bankrupt and was taken over by the Resolution Trust Company, JWP continued to carry the receivable at full value.

These irregularities resulted in substantial overstatement of JWP's income in each of the years 1988 through 1990, with E&Y's knowledge and acquiescence. The annual no-default letters issued by E&Y were also false in that they certified that JWP's books had been kept in accordance with GAAP, which E&Y knew was untrue.

## Materiality

As previously stated, it is impossible to assign a precise number to the overstatement of JWP's assets and earnings in 1990 and prior years. In 1994, after extensive review by both E&Y and Deloitte & Touche, JWP's 1990 financials were restated to reduce pre-tax net income from $93 million to $83 million. Plaintiffs' expert, Dr. Livingstone, testified that 1990 income was actually overstated by $134 million, a correction which would have resulted in a net loss of $41 million. However, as previously noted, his computations were seriously flawed. Moreover, his credibility was weakened by the fact that his original opinion, as expressed in discovery depositions and answers to contention interrogatories, was that 1990 pre-tax income had been overstated by only

$67 million, which would still leave net income of $26 million. It was not until after the Court ruled that the audited annual reports for 1991 and later years were not relevant because they were not received by plaintiffs until after their last purchases of JWP's notes, a ruling which gave plaintiffs a strong incentive to push the overstatement of earnings back to 1990 and earlier, that Dr. Livingstone expressed a new opinion which exactly doubled his calculation of the overstatement of 1990 pre-tax earnings.

The restatement of JWP's earnings which was done in 1994 was not carried back to the years before 1990, ostensibly for lack of sufficient records. Nevertheless, from the foregoing discussion of accounting irregularities in 1987 through 1990, it seems clear that the overstatement of assets and earnings in those years was of such magnitude that a reasonable investor would consider it significant in making an investment decision. Thus the Court finds that, under the test of *TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976), as applied to Section 10(b) cases in *Basic, Inc. v. Levinson*, 485 U.S. 224, 231–232, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988), the false representations in the audited annual reports and no-default letters for 1987 through 1990 were material.

## Reliance

There was ample evidence that, in making their decisions to purchase JWP's notes, each of the plaintiffs studied and relied upon JWP's audited annual reports for the years prior to their purchases. The officials of a number of the plaintiffs responsible for the decision to purchase JWP's notes testified that they had insisted upon having its annual reports for at least the preceding five years and explained in detail how they had used those reports to compute the various ratios on which they relied in assuring themselves as to the ability of JWP to make timely payments of interest and principal. Although there was not specific testimony that each of the plaintiffs who purchased JWP's notes on a second or third occasion relied upon the no-default letters it had received on previous purchases, it is reasonable

to assume that they did so, because their Note Agreements required that the letters be issued to JWP for the express purpose of transmittal to them. The Court therefore finds that the requirement of reliance has been satisfied.

## Scienter

■ A critical element of a cause of action under Section 10(b) is that the defendant must have acted with scienter—that is, with knowledge of the falsity of its representations and with intent to deceive investors, *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193, 96 S.Ct. 1375, 47 L.Ed.2d 668(1976), or with such recklessness that an intent to deceive may be inferred. *Decker v. Massey–Ferguson, Ltd.*, 681 F.2d 111, 120–21 (2d Cir.1982); *In re Leslie Fay Cos. Sec. Litig.*, 871 F.Supp. 686, 692 (S.D.N.Y.1995).

■ Because it is seldom if ever possible to prove the state of a defendant's mind by direct evidence, finders of fact have almost always had to rely on circumstantial evidence to determine intent. The Court of Appeals for the Second Circuit has recognized two ways of alleging scienter in Section 10(b) cases. "The first approach is to allege facts establishing a motive to commit fraud and an opportunity to do so. The second approach is to allege facts constituting circumstantial evidence of either reckless or conscious behavior." *In re Time Warner Inc. Sec. Litig.*, 9 F.3d 259, 269 (2d Cir.1993); *see also San Leandro Emergency Med. Group Profit Sharing Plan v. Philip Morris Cos., Inc.*, 75 F.3d 801, 813 (2d Cir.1996).

■ Here there is no question that E&Y had the opportunity to commit fraud, but the motivation for it to do so appears much weaker than the countervailing pressures. E&Y had nothing to gain by defrauding JWP's investors except the preservation of good relations with the client. But it had a three-year contract with JWP to provide auditing services for the years 1988 through 1990. The contract was not a very lucrative one for E&Y, which landed it by underbidding the previous auditors. The annual fee, ranging from $250,000 in 1988 to $280,000 in 1990, was a minuscule part of E&Y's annual billings. It seems highly unlikely that E&Y

would deliberately jeopardize its priceless reputation and expose itself to expensive and potentially disastrous litigation in order to retain such a small account. "It would defy common sense to hold that [scienter] would be satisfied merely by alleging the receipt of normal compensation for services rendered." *Friedman v. Arizona World Nurseries Ltd.*, 730 F.Supp. 521, 532 (S.D.N.Y.1990), *aff'd mem.*, 927 F.2d 594 (2d Cir.1991). Even a "long and profitable relationship" has been ruled to be "an insufficient basis for inferring [fraudulent] intent." *In re Leslie Fay Cos. Sec. Litig.*, 871 F.Supp. at 699. *Accord, SEC v. Price Waterhouse*, 797 F.Supp., 1217, 1242 (S.D.N.Y.1992). However, the motive of financial gain is not a necessary element of scienter, "so long as the plaintiff ... adequately identifies circumstances indicating conscious behavior by the defendants." *Cosmas v. Hassett*, 886 F.2d 8, 13 (2d Cir.1989). *Accord, Elkind v. Liggett & Myers, Inc.*, 635 F.2d 156, 172 (2d Cir.1980).

■ The evidence in this case establishes that E&Y was well aware that JWP's books had not been kept in accordance with GAAP and that JWP's annual reports, which it certified, were incorrect in many significant respects. However, scienter requires more than proof that E&Y issued an unqualified audit report on financial statements that were inaccurate. *O'Brien v. National Property Analysts Partners*, 719 F.Supp. 222, 228 (S.D.N.Y.1989). Moreover, "allegations of a violation of GAAP provisions ... without corresponding fraudulent intent, are not sufficient to state a securities fraud claim." *Chill v. General Electric Co.*, 101 F.3d 263, 270 (2d Cir.1996). Under GAAS, the auditor's responsibility is not to guarantee the accuracy of every line item in the client's financial statements but merely to express an opinion as to whether those statements fairly represent its financial condition "in all material respects" and to obtain "reasonable assurance" of that opinion through its audit procedures. (AU 110.01–.02, 312.02–.13, 316.05, .08).

In this case, E&Y's deficiency was not in the planning or execution of its annual audits. They were sufficiently thorough and effective

to uncover virtually all of the violations of GAAP which were ultimately corrected in the restatements or which have been asserted by plaintiffs' expert Dr. Livingstone. Instead E&Y's failure lay in the seeming spinelessness of John LaBarca and the other E&Y accountants in their dealings with JWP, and particularly with its CFO, Ernest Grendi. When they met to discuss E&Y's annual Summary of Audit Differences, Grendi almost invariably succeeded in either persuading or bullying them to agree that JWP's books required no adjustment. Part of the problem was undoubtedly the close personal relationship between Grendi and LaBarca. Grendi had been a partner of LaBarca in E&Y's predecessor firm and they continued to be good friends, regularly jogging together in preparation for the New York City Marathon. For whatever reason, the record suggests that, in their confrontations with Grendi, LaBarca and his associates exhibited a level of tolerance and timidity inappropriate for an independent auditor. The "watch dog" behaved more like a lap dog.

Obviously, an audit becomes a pointless exercise if the auditor, after discovering substantial errors in a publicly owned company's financial statements, supinely acquiesces in the client's refusal to correct the errors and certifies the statements anyway.

However, in this case, E&Y strenuously argues that, with respect to all of the issues which LaBarca and his associates raised in their discussions of audit differences with Ernest Grendi, they were ultimately convinced either that there was a reasonable basis for JWP's accounting treatment of each of these items or that the cumulative amount of earnings overstatement involved was not material. E&Y had a materiality standard of 5% of earnings. If the errors cumulatively resulted in a earnings overstatement which did not exceed that threshold, the errors were deemed immaterial. While that inhouse benchmark is not binding on the Court, it is at least relevant to the Court's determination of intent.

It is a close question whether the justifications which Grendi advanced for JWP's accounting treatments with respect to each of the audit differences raised by E&Y were so unreasonable and whether the total amount involved was so substantial that E&Y's ultimate acceptance of those treatments would fairly support an inference that E&Y intended to deceive investors. As it happens, this is an issue which the Court need not resolve, for there is another reason why plaintiffs' claims of fraud must fail.

## Causation

Section 10(b) was not intended to insure all investors against loss. It is merely a declaration that securities fraud is unlawful. *Bastian v. Petren Resources Corp.*, 892 F.2d 680, 683 (7th Cir.1990). The right to bring a private action for damages resulting from such fraud is an implied right, *Superintendent of Insurance v. Bankers Life & Casualty Co.*, 404 U.S. 6, 13 n. 9, 92 S.Ct. 165, 30 L.Ed.2d 128 (1971), whose dimensions have been defined by reference to the common law of torts, *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 744–49, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975), including the requirement of proximate causation. *Litton Industries, Inc. v. Lehman Bros. Kuhn Loeb Inc.*, 967 F.2d 742, 747 (2d Cir. 1992).

In *Schlick v. Penn–Dixie Cement Corp.*, 507 F.2d 374, 380 (2d Cir.1974), the Second Circuit Court first articulated the principle that causation in an action under Section 10(b) includes two necessary elements: transaction causation and loss causation. That is, the plaintiff must prove not only that it would not have made the investment but for the defendant's fraud but also that the fraud caused the plaintiff's loss on the investment.

The Court has repeatedly announced its adherence to this principle, but has not followed it with perfect consistency. In *Marbury Management, Inc. v. Kohn* et al., 629 F.2d 705 (2d Cir.1980), Kohn, a trainee employed by a brokerage firm, induced the plaintiff to purchase securities by falsely claiming that he was a "lawfully licensed registered representative" and "portfolio management specialist." The Court affirmed the judgment for the plaintiff because "Kohn's statements by their nature induced both the purchase and the retention of the

securities." The majority opinion reasoned that "[d]ifferentiating transaction causation from loss causation can be a helpful analytical procedure only so long as it does not become a new rule effectively limiting recovery for fraudulently induced securities transactions to instances of fraudulent representations about the value characteristics of the securities dealt in." *Id.* at 710, fn. 3. This prompted a strong dissent by Judge Meskill, who pointed out that "the majority overlooks the fundamental principle of causation which has long prevailed under the common law ... that the injury averred must proceed directly from the wrong alleged and must not be attributable to some supervening cause." *Id.* at 716–17. The dissent added, "While it is true that Kohn's misrepresentations may have been a precondition of the ensuing injury in that the investments might not have been made had he revealed his lack of qualifications, those misstatements nevertheless do not constitute the legal cause of the subsequent pecuniary loss and consequently will not suffice to establish an actionable fraud." *Id.* at 717.

Two years later in *Chemical Bank v. Arthur Andersen & Co.,* 726 F.2d 930, 943 (2d Cir.1984) the Court reaffirmed the necessity of proving loss causation (" 'but for' causation is not enough"). But two years thereafter in *Manufacturers Hanover Trust Co. v. Drysdale Securities Corp.,* 801 F.2d 13, 20–22 (2d Cir.1986), the Court wavered again, paying lip service to the loss causation requirement, but ruling the defendant liable "since, presumably, MHT would not have contracted with DGSI to purchase and sell government securities had MHT known of the misrepresentation regarding DGSIs finances,"—in other words, on the basis of transaction causation alone.

However in *Citibank, N.A. v. K–H Corp.,* 968 F.2d 1489, 1495 (2d Cir.1992), the Court again sought to put the matter at rest by emphasizing that "this Court also requires the plaintiff to allege that the misrepresentation induced it to enter into the transaction and that the misrepresentation was the cause of the actual loss suffered." Even more specifically, the Court stated that "a plaintiff must prove that the damage suffered was a foreseeable consequence of the misrepresentation." *Id.* at 1495. The principle was reiterated and applied in *First Nationwide Bank v. Gelt Funding Corp.,* 27 F.3d 763, 769 (2d Cir.1994). Thus, after occasional uncertain steps, the Second Circuit has now landed, with apparent finality, in square agreement with the rule followed in the overwhelming majority of other circuits, including the Fourth (*Gasner v. Board of Supervisors,* 103 F.3d 351 (1996)), Fifth (*Huddleston v. Herman & MacLean,* 640 F.2d 534, 548 (1981), *rev'd in part on other grounds,* 459 U.S. 375, 103 S.Ct. 683, 74 L.Ed.2d 548 (1983)), Sixth (*Murray v. Hospital Corp. of America,* 873 F.2d 972 (1989)), Seventh (*Bastian, supra,* 892 F.2d 680, 683–85 (1990)), and Eleventh (*Robbins v. Koger,* 116 F.3d 1441 (1997)). Although two other circuits, the Eighth (*In re Control Data Securities Litigation,* 933 F.2d 616 (1991)) and Ninth (*Knapp v. Ernst & Whinney,* 90 F.3d 1431 (1996)), assume loss causation in cases based on a fraud-on-the-market theory, no such theory of recovery is advanced by the plaintiffs here, who purchased debt instruments at par in private placements.

■ Therefore, to succeed on their Section 10(b) claims in this case, plaintiffs must establish that their losses were caused by the misrepresentations in E&Y's audit opinions and no-default letters. More precisely, they must prove not only that they would not have purchased JWP's notes but for such misrepresentations (transaction causation) but also that JWP would not have defaulted on its obligations on the notes if JWP's financial condition had been as represented (loss causation).

It is by no means clear that plaintiffs have proven even transaction causation. The evidence does not clearly establish that if all of the irregularities in JWP's financial statements for the years 1987 through 1990 had been corrected, this would have so altered the total mix of information available to plaintiffs that they would not have invested in JWP's notes. The restatement of JWP's 1990 annual report (the most recent one relevant here), which was done in 1994 after extensive review by Deloitte & Touche and E&Y, reduced pre-tax net income by only

11%, from $93 million to $83 million. As previously noted, the testimony of plaintiffs' expert that the reduction should have been considerably greater was less than convincing. To a potential purchaser of JWP's common stock, such a difference might be meaningful because it might significantly diminish the expectation of future dividends and price appreciation. But plaintiffs were purchasing debt securities, and their main concern was JWP's cash flow and its ability to pay interest and principal. To such investors, a fractional difference in net income may be inconsequential. *See Norwood Venture Corp. v. Converse Inc.,* 959 F.Supp. 205, 209–10 (S.D.N.Y.1997).

■■■ However this Court need not resolve the issue of transaction causation, because the evidence definitely fails to establish the necessary loss causation. · JWP's insolvency and resulting default on its note obligations were caused not by the differences between its actual financial condition and that reflected in its audited annual reports, but by much more significant factors, including JWP's disastrous acquisition of the failing Businessland, in combination with the downturn in commercial construction and fierce competition in the PC market.

It is important to note that virtually every one of the errors found in JWP's books (the abuses of purchase accounting for corporate acquisitions, the arbitrary write-up of small-tool inventories, the improper accounting for NOL carryforwards, the write-up of spurious claims for extras, and the failure to establish reserves for receivables of doubtful collectibility) involved non-cash items which did not affect JWP's cash balances or its actual cash flow. As previously stated, these errors did increase reported net income. They thus increased *apparent* cash flow, which is computed by a simple formula popularly known by the mnemonic acronym EBITDA (earnings before interest, taxes, depreciation and amortization). However, they had no effect on *actual* cash flow or on JWP's ability to discharge the obligations for principal and interest on its debt. Indeed, JWP continued to pay all of the interest due through 1992.

There is ample reason to believe the testimony of JWP's former Chief Executive Officer, Andrew Dwyer, that JWP would not have defaulted on its debt obligations but for its acquisition of Businessland, which turned out to be a veritable sinkhole for cash. Even after restatement of its annual reports, JWP continued to show substantial profits and increasing cash flows through 1991. In 1992, largely because of the mountainous restructuring·charges incurred in the integration of Businessland into its I/S Division, JWP suffered a net loss of $612 million and a *negative* cash flow of $49.6 million, losses which continued through 1993. There was simply insufficient cash remaining to pay plaintiffs and the other creditors who threw the company into involuntary bankruptcy in December 1993. It is immaterial that most of the restructuring charges were nonrecurring and that Businessland became profitable after it was sold to others because the charges were of sufficient size and duration to cause JWP's default and bankruptcy; Businessland's ultimate profitability in the hands of other owners could not undo the past.

Plaintiffs' contention that JWP's default in 1993 was not caused by its loss of $735 million in 1992 and 1993 but by the fact that its earnings back in the years 1987 to 1990 were less than reported (although still substantial) stretches advocacy beyond rationality.

It would be manifestly unfair, as well as contrary to law, to hold E&Y jointly and severally liable to reimburse in full losses that JWP's noteholders sustained as a result of unforeseeable and independent post-audit events and not because of fiscal infirmities which were concealed by JWP's misleading financial statements. *See Revak v. SEC Realty Co.,* 18 F.3d 81, 89–90 (2d Cir.1994).

## Limitations

■■■ In *Lampf, Pleva, Lipkind & Petigrow v. Gilbertson,* 501 U.S. 350, 364, 111 S.Ct. 2773, 115 L.Ed.2d 321 (1991), the Supreme Court ruled that private actions under Section 10(b) must be commenced within one year after discovery of the facts constituting the violation and within three years after the violation occurred. The Second Circuit has held that " 'discovery' ... includes constructive or inquiry notice, as well as actual no-

tice." *Menowitz v. Brown*, 991 F.2d 36, 41 (2d Cir.1993). The standard is an objective one:

> A plaintiff in a federal securities case will be deemed to have discovered fraud ... when a reasonable investor of ordinary intelligence would have discovered the existence of the fraud.... Moreover, when the circumstances suggest to an investor of ordinary intelligence that she has been defrauded, a duty of inquiry arises, and knowledge will be imputed to the investor who does not make such an inquiry. Such circumstances are often analogized to "storm warnings."

*Dodds v. Cigna Securities, Inc.*, 12 F.3d 346, 350 (2d Cir.1993) (internal citations omitted). However, the circumstances must be "such as to suggest to a person of ordinary intelligence the *probability* that he has been defrauded by defendant." *Armstrong v. McAlpin*, 699 F.2d 79, 88 (2d Cir.1983) (emphasis added). If a plaintiff who has been put on inquiry notice is reasonably diligent in investigating to determine whether fraud has been perpetrated, the running of the limitations period is tolled during such investigation. *See Westinghouse Elec. Corp. v. 21 Int'l Holdings, Inc.*, 821 F.Supp. 212, 222 (S.D.N.Y.1993).

 In September 1993, the plaintiffs in this action entered into a tolling agreement with E&Y under which the action is deemed to have been filed on September 23, 1993. Therefore if plaintiffs were on inquiry notice as to the fraud charged before September 23, 1992 and did not diligently pursue an inquiry at least until that date, all their Section 10(b) claims are barred. Plaintiffs have asserted no Section 10(b) claims based on their purchases of notes before September 23, 1990 because such claims are barred by the three-year prong of the limitation.

In our May 22, 1996 decision on defendants' motions for summary judgment, 928 F.Supp. 1239, 1250, we stated that plaintiffs were placed on inquiry notice by August 14, 1992, when JWP issued a press release announcing that as a result of a review by outside auditors it was restating its consolidated financial statement for the first quarter of 1992 and revising its earnings results from the second quarter of 1992 to reflect net after-tax charges totaling $64.5 million. The press release also disclosed that a total of thirteen shareholder class-action suits had been filed, charging that JWP and its management had violated Section 10(b) by making false and misleading statements in various public documents including JWP's annual reports and that, in one of those suits, E&Y had also been named as a defendant.

However that ruling of May 22, 1996 was made in the context of the consolidated action, which included claims by the noteholder plaintiffs not only against E&Y but also against JWP's officers and directors. Moreover it was made before the Court had ruled that because JWP's audited annual report for 1991, as well as all later financial statements, were not published until after plaintiffs made their last purchases of JWP's notes, that report and the later statements were irrelevant except to the extent that they tended to show errors in JWP's earlier statements. The Court did not rule that JWP's press release of August 14, 1992, which referred only to restatement of JWP's financials for the first quarter of 1992 and to revision of the results for the second quarter of 1992, was sufficient to alert plaintiffs to the likelihood that JWP's audited annual reports for 1990 and earlier were materially false or misleading. Much less did the Court find that the press release alerted plaintiffs to the likelihood that E&Y, in certifying the earlier statements and issuing its annual no-default letters, had either knowingly concealed the errors in the statements and JWP's failure to follow GAAP in preparing them, or had failed to discover the errors because of the reckless conduct of its audits.

The fact that a number of shareholder class-action suits had been filed against JWP's officers and directors, even though one of the actions also named E&Y as a defendant, was not enough to alert the noteholder plaintiffs of the likelihood that they had a viable Section 10(b) claim against E&Y. The earliest starting date of the class period alleged in any of the actions was August 5, 1991, long after publication of E&Y's audited annual report for 1990, so the actions did not alert plaintiffs to the probabil-

ity of errors in E&Y's annual reports for 1990 and earlier years—the only reports relevant here. In addition, the shareholders were suing on the basis of the precipitous drop in the market price of their shares, a triggering event which did not directly affect the holders of JWP's debt securities. They were still being paid the full interest due to them, and might never suffer any loss, so long as JWP's cash flow was sufficient to fund the payments of interest and principal, regardless of what might happen to the price of JWP's stock. Thus the Second Circuit Court in *In re Ames Department Stores, Inc. Stock Litigation*, 991 F.2d 953 (2d Cir.1993) ruled that the filing of a shareholder class-action suit did not as a matter of law put the noteholders on inquiry notice that they may also have fraud claims because

> holders of equity securities often, perhaps usually, have different concerns from those of holders of debt securities. What primarily matters to the latter is that the company meet its obligations on the debt instrument when due. In contrast, investors in equity securities generally are concerned with a company's earnings prospects since equity securities usually trade, to a greater extent, on a company's earnings outlook.

For all these reasons, the Court finds that neither the press release of August 14, 1992 nor any other information which plaintiffs knew or should have known before September 23, 1992 was sufficient to place them on inquiry notice of the likelihood that they had a viable claim of fraud against E&Y. Therefore plaintiffs' Section 10(b) claims against E&Y are not barred by limitations.

## PLAINTIFFS' CLAIMS FOR COMMON LAW FRAUD

■ Under New York law, a cause of action for common law fraud requires proof of scienter, which has the same meaning as for claims under the federal securities laws, requiring an actual intent to defraud, *Lama Holding Co. v. Smith Barney Inc.*, 88 N.Y.2d 413, 646 N.Y.S.2d 76, 668 N.E.2d 1370, 1372 (N.Y.1996), or such recklessness that an intent to defraud may be inferred, *Curiale v. Peat, Marwick, Mitchell & Co.*, 214 A.D.2d 16, 630 N.Y.S.2d 996, 1002–03 (1st Dep't

1995) (citing *State St. Trust Co. v. Ernst*, 278 N.Y. 104, 15 N.E.2d 416 (N.Y.1938)). Indeed, the standard of proof for claims of common law fraud is even more stringent: such claims must be proved not by a mere preponderance of the evidence but by clear and convincing evidence. *Banque Arabe et Internationale D'Investissement v. Maryland National Bank*, 57 F.3d 146, 153 (2d Cir.1995). However, as discussed above, the Court finds it unnecessary to resolve the issue whether E&Y's conduct of the audits was so reckless that an intent to defraud can be inferred because all of plaintiffs' fraud claims must fail for the independent reason that plaintiffs' loss was not caused by the alleged fraud but by other factors such as JWP's disastrous acquisition of the failing Businessland.

## PLAINTIFFS' CLAIMS FOR NEGLIGENT MISREPRESENTATION

■ As indicated above, there is considerable evidence that E&Y was negligent in certifying JWP's annual reports knowing that they contained significant errors and in issuing its annual no-default letters knowing that E&Y's books had not been kept in accordance with GAAP. However, in order to recover against E&Y for their investment losses, plaintiffs must also prove that these losses were proximately caused by E&Y's negligence, *Revak v. SEC Realty Corp.*, 18 F.3d 81, 89–90 (2d Cir.1994), and that there was either privity or a relationship approaching privity between them and E&Y, so that E&Y owed them a duty of care which was breached by such negligence. *Credit Alliance Corp. v. Arthur Andersen & Co.*, 65 N.Y.2d 536, 493 N.Y.S.2d 435, 483 N.E.2d 110, 114–15 (1985); *see also Security Pacific Business Credit, Inc., v. Peat Marwick Main & Co.*, 79 N.Y.2d 695, 586 N.Y.S.2d 87, 597 N.E.2d 1080 (N.Y.1992).

■ In *Credit Alliance*, the New York Court of Appeals established a three-prong test for determining whether a "near privity" relationship is present: (1) the defendant must have been aware that its representation would be used for a particular purpose; (2) the defendant must have intended that a known party or parties would rely thereon in

furtherance of that purpose; and (3) there must have been some conduct on the part of the defendant linking it to that party or parties' reliance. *Credit Alliance*, 65 N.Y.2d 536, 493 N.Y.S.2d 435, 483 N.E.2d at 118.

As the Court ruled in its May 22, 1996 opinion on defendants' motions for summary judgment, there was no privity· between plaintiffs and E&Y insofar as concerns E&Y's audits of JWP's annual reports, which were conducted at the instance and expense of JWP. E&Y had no way of knowing that its audit reports would be relied upon by these plaintiffs in making a decision to purchase JWP's notes. However, E&Y's annual no-default letters were a somewhat different matter. They were sent to JWP for the express purpose of being forwarded to the noteholders. E&Y knew the identity of the noteholders entitled to receive the letters, and knew that some insurance companies had purchased JWP's notes on more than one occasion. It therefore must been aware of the possibility that some of those who received its no-default letters might be influenced by them in deciding whether to purchase such notes in the future. However, it could not possibly know even whether JWP would sell notes in the future, much less which of the recipients of its letters would buy them. Thus it appears clear that at least the second requirement of the *Credit Alliance* test was not satisfied and that there was no relationship of near-privity between E&Y and the future purchasers as defined in that case.

Moreover, whether or not there was such a relationship, plaintiffs' claims for negligent misrepresentation must fail for the independent reason that the evidence clearly showed that their losses were not caused by any financial weaknesses which were camouflaged by JWP's audited annual reports.

## PLAINTIFFS' OTHER CONTENTIONS

The Court has duly considered all of plaintiffs' other contentions not previously discussed, including the arguments that JWP was not a bona fide enterprise but a "Ponzi scheme;" that the acquisition of Businessland increased JWP's earnings; that the PC price wars increased distributors' profits; that

E&Y's audit was so deficient in scope as to be "no audit at all;" and that E&Y engaged in deliberate spoliation of evidence to conceal their complicity in JWP's fraud. However the trial record does not support any of these contentions.

The Court does find ample evidence to support another contention which appears, in various forms, throughout plaintiffs' briefs and proposed findings: that the weakness of JWP's internal controls allowed and even encouraged accounting abuses. Until David Sokol was brought in as president in January 1992, JWP's internal auditing department was scarcely worthy of the name. The accountants in that department spent much of their time performing routine bookkeeping chores instead of reviewing JWP's accounting practices to assure their compliance with GAAP. When they did find violations of GAAP, they were too intimidated to press for correction of them. The Audit Committee was a worthless window ornament. It rarely met and when it did it did not get reports from the internal auditors. It did get reports from E&Y as to accounting abuses they had uncovered, but apparently did nothing to correct them. "Topside adjustments" directed by the CFO Ernest Grendi were a frequent manipulative device. It became a well-worn inside joke to refer to the lax accounting standards at JWP as "EGAAP," an acronym for Ernest Grendi's Accepted Accounting Practices. The "tone at the top" was such as to condone and even encourage "creative" bookkeeping. The common practice of writing up exaggerated profits on uncompleted construction contracts at the end of each quarter produced such pronounced periodic spikes in the graph of JWP's profits that it became known as the "High Sierras." E&Y was well aware of the weakness in JWP's internal controls and, in its meetings with Ernest Grendi, proposed strengthening them but did not insist that this be done as a condition to the issuance of clean audit reports. Again, E&Y's fault lay not in the planning or execution of its audits but in the fact that John LaBarca and his associates apparently lacked the backbone to stand up to the intransigent and intimidating Ernest Grendi and insist upon the changes neces-

sary for compliance with GAAP. Such invertebrate pliability can be a disabling handicap for an independent auditor but, as previously noted, the Court deems it unnecessary to decide whether in this case the infirmity was so serious that it can be diagnosed as symptomatic of an intent to defraud investors.

## SUMMARY

The securities laws recognize the critical importance of the reliability of the financial statements of companies whose securities are offered for sale, and of the indispensable role played by the independent auditors who verify the substantial accuracy of such statements. There is considerable evidence in this case tending to show that E&Y failed to fulfill its professional obligation to assure that the annual reports of JWP which it certified fairly portrayed the true financial condition of the company. The evidence clearly establishes that plaintiffs relied on those reports in deciding to purchase JWP's notes and that they lost roughly $100 million on those investments. But both Section 10(b) and the New York common law require more than that to hold E&Y jointly and severably liable for plaintiffs' entire loss. They require proof not only that E&Y acted with scienter—that is, either with the specific intent to defraud investors or with such recklessness that such an intent may be inferred, but also that the fraud was a proximate cause of their loss—that is, that JWP would not have defaulted on the notes they purchased if its financial condition had been as represented in its annual reports.

Even assuming, without deciding, that plaintiffs have proven that E&Y acted with the necessary scienter, all of their claims must fail because the evidence clearly shows that their losses were not caused by the fiscal infirmities concealed by JWP's erroneous annual reports but by unforeseeable post-audit developments which would have caused JWP's insolvency and default even if its financial condition had been fully as healthy as was represented in those reports.

Plaintiffs' third claim, for negligent misrepresentation under New York law, must fail for the additional reason that it requires a relationship of near-privity which did not exist with respect either to E&Y's annual audit reports or to its accompanying no-default letters.

For the reasons stated, all of plaintiffs' claims are dismissed, with taxable costs to defendant. Each party shall bear its own attorneys fees. Defendant shall submit a proposed Judgment Order on ten days' notice to plaintiffs.

So ordered.