**AUSA LIFE INSURANCE COMPANY, et al., Plaintiffs,**

v.

**ERNST & YOUNG, Defendant.**

**No. 94 Civ. 3116 (WCC).**

United States District Court, S.D. New York.

Oct. 11, 2000.

As Amended Oct. 18, 2000.

Cadwalader, Wickersham & Taft, New York City, Debra Brown Steinberg, Edwin David Robertson, Morgan, Lewis & Bockius LLP, Washington, DC, Peter Buscemi, of counsel, for plaintiffs.

Mayer, Brown & Platt, Chicago, IL, Alan N. Salpeter, Michele Odorizzi, Howard J. Roin, Esq., Caryn Jacobs, Linda T. Coberly, of counsel, Ernst & Young LLP, General Counsel's Office, New York City, Kathryn A. Oberly, Patricia A. Connell, of counsel, for defendant.

## OPINION AND ORDER

WILLIAM C. CONNER, Senior District Judge.

This securities fraud action was remanded to this Court by the United States Court of Appeals for the Second Circuit for additional findings of fact on the issue of loss causation. 206 F.3d 202. Counsel for the parties agreed that no additional evidence was required or desired and that, after briefing of the issue by the parties, the Court should make the necessary supplemental findings on the basis of the existing record. Those briefs having been received and considered and the record having been reviewed in light of the views expressed in the several opinions of the Court of Appeals, this Court files herewith its Supplemental Findings of Fact, which will be summarized and explained in this Opinion.

## BACKGROUND

As more fully delineated in this Court's prior Opinion, reported at 991 F.Supp. 234, this action is one of 22 lawsuits brought by investors in the securities of JWP, Inc. ("JWP"). All 20 of the actions brought by those who lost money on their acquisitions of JWP's common stock have been settled. This and the one other remaining action were brought by a group of insurance companies who purchased JWP's notes. The other action, which is still pending, was brought against certain officers and directors of JWP who allegedly perpetrated fraud in overstating the company's assets and earnings during the years prior to plaintiffs' purchases of the notes. Because the defendants in that action are substantially judgment-proof and because the company's directors and officers ("D & O")

liability insurance coverage has been substantially exhausted by the settlement of the stock purchasers' actions and by defense costs, that action will undoubtedly be settled for a small fraction of the claims. Thus, the only hope of the note purchasers for substantial recoupment of their losses is the present action against Ernst & Young ("E & Y"), the accounting firm that served as JWP's auditor from 1985 through completion of the audit of JWP's consolidated annual report for 1992, encompassing the entire period of the alleged fraud.

## The Issues in this Case and the Prior Proceedings in this Court

In this action, plaintiffs charge that E & Y, having discovered substantial errors in JWP's accounts, and knowing that they had not been kept in accordance with generally accepted accounting principles ("GAAP"), nevertheless certified as accurate JWP's financial reports for the years 1987 through 1991, and issued to the noteholders the annual "no-default" letters required by their Note Agreements with JWP, certifying that their audits had uncovered no breaches of any obligations under the Note Agreements which included, inter alia, the requirement that JWP's books be kept in accordance with GAAP. Plaintiffs further claim that, in reliance on these certified financial statements and no-default letters, they purchased a total of $149 million in face value of JWP's notes in private placements between November 1988 and March 1992 and, after JWP defaulted on interest payments due on the notes and was thrown into involuntary bankruptcy, settled for a net loss of slightly more than $100 million in principal and unpaid interest. Plaintiffs asserted claims under Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and for common law fraud and negligent misrepresentation.

After an 11-week trial, this Court filed extensive Findings of Fact and Conclusions of Law, with an accompanying Opinion and Order in which:

(a) The Section 10(b) claim was dismissed because, although E & Y had knowingly made material false representations which induced plaintiffs to invest in JWP's notes (so that there was "transaction causation"), there was not "loss causation" because "JWP's insolvency and resulting default on the notes were caused not by the differences between its actual financial condition and that reflected in its audited annual reports, but by much more significant factors, including JWP's disastrous acquisition of the failing Businessland, in combination with the downturn in commercial construction and fierce competition in the PC market." 991 F.Supp. at 250. At the time the notes were purchased, even after correction of all the accounting errors which were found or proven, JWP actually had more than ample cash flow to discharge all its obligations on the notes when due, and did in fact pay interest in full through the end of 1992. *Id.* "JWP would not have defaulted on its debt obligations but for its acquisition of Businessland, ... a veritable sinkhole for cash." *Id.* Thus, plaintiffs' "losses were not caused by the fiscal infirmities concealed by JWP's annual reports but by unforeseeable post-audit developments which would have caused JWP's insolvency and default even if its financial condition had been fully as healthy as was represented in those reports." *Id.* at 254.

(b) The common law fraud claim was dismissed for the same reason—lack of proximate cause. *Id.* at 252.

(c) The negligent misrepresentation claim was dismissed for lack of proximate cause and because there was no relationship approaching privity between plaintiffs and E & Y since at the time it certified JWP's finanacial statements and issued the no-default letters, E & Y did not even know whether JWP would be issuing additional notes, much less who the purchasers of those notes would be, so that there was no satisfaction of the second requirement of the three-prong test of *Credit Alliance Corp. v. Arthur Andersen & Co.*, 65 N.Y.2d 536, 483 N.E.2d 110, 493 N.Y.S.2d 435 (1985), namely that "the defendant must have intended that a *known* party or parties would rely [on its representations]." *Id.* at 252–53 (emphasis added).

The Court of Appeals Opinions

Plaintiffs' appeal from this Court's judgment was argued December 7, 1998. However, the Court of Appeals did not issue an opinion in the case until March 17, 2000, more than 15 months later. The reason for this unusual delay became apparent when each of the three judges on the panel handed down a separate opinion, advocating a resolution of the issue of loss causation differing from that advanced by the other two members of the panel. Apparently, for over a year, each of the judges had firmly held out for his own views on this issue and refused to concur in the views of either of his brothers. The impasse was finally broken when Judge Jacobs graciously yielded, explaining, "In order to allow the Court to issue a mandate, I have shifted my vote on the issue of loss causation—from affirmance to vacatur with a remand for further findings." 206 F.3d at 225. However, Judge Jacobs indicated that he believed the remand unnecessary, adding, "If, as I think, the district court has implicitly decided the fact question that is now being remanded for consideration, the district court's adoption of those findings of fact will under this mandate result in the same judgment that the district court has entered and that I would affirm on the present record and findings." *Id.*

None of the three judges on the panel indicated that he would reverse any of the findings of fact made by this Court. Judge Jacobs specifically stated that he would affirm all of them. *Id.* at 225. Judge Oakes stated that he agreed with "most of" them and that, "[t]hose with which we

do not agree are not clearly erroneous." *Id.* at 210. Chief Judge Winter did not express disagreement with any of the findings, and relied upon them in concluding that "the facts found by the district court demonstrate loss causation as a matter of law." *Id.* at 228.

Chief Judge Winter reasoned that plaintiffs were misled not only as to JWP's financial condition but also as to "(i) the quality of the firm's management and auditor; and (ii) the firm's current incentives with regard to risk aversion." *Id.* at 230. He concluded that the pattern of JWP's accounting deceptions and the financial weakness they concealed tempted its management "to seek salvation in a risky deal" and increase the company's profitability before disclosure of the fraud, so that "the collapse of JWP as a result of the Businessland venture was well within the zone of risk concealed by the misrepresentations." *Id.* at 237–38. Neither of the other members of the panel shared this expansive view of foreseeability.

 All three opinions did agree that, in the context of securities fraud, the causation required for liability comprises both transaction causation and loss causation. *Id.* at 209, 225, 233. All three also agreed that the touchstone of loss causation is foreseeability. *Id.* at 211–15, 226, 233. Judge Oakes' opinion, which became the prevailing opinion of the Court when Judge Jacobs, with expressed reluctance, concurred in it, framed that issue in these terms:

> The foreseeability query is whether E & Y could have reasonably foreseen that their certification of false financial information could lead to the demise of JWP, by enabling JWP to make an acquisition that otherwise would have been subjected to higher scrutiny, which led to harm to the investors.

*Id.* at 217. Remarking that this Court "did not make factual findings as to foreseeability specifically," the Court of Appeals remanded the case for "more factual findings" with instructions to "reconsider proximate cause in the context of its factual determinations on foreseeability." *Id.* The majority opinion then offered "a tow rope to assist the district court through this Serbonian Bog" by counseling:

> A foreseeability finding turns on fairness, policy, and, as before, "a rough sense of justice." ... "A 'reasonably foreseeable act' might well be regarded as an act that a reasonable person who knew everything that the defendant knew at the time would have been able to know in advance with a fair degree of probability." ... Where foreseeability is less than immediately obvious, it is appropriate to make a judgment based on "some social idea of justice or policy." ... These considerations should be coupled with the recognition that proximate cause is a common law concept, and such concepts evolve in a manner that reflects "economic, social and political developments." ... "Therefore it is appropriate to examine the underlying policy of the securities law involved and the climate of securities regulation as it has evolved and as it currently exists."

*Id.* at 217–18 (citations omitted).

Judge Oakes' opinion proceeded to review the history and underlying purposes of the securities laws, with particular emphasis on the objectives of (a) encouraging issuers of corporate securities to disclose financial information voluntarily, and (b) encouraging losing investors to pursue valid claims and encouraging defendants to fight abusive claims. He concluded that these considerations weigh in favor of finding loss causation in the present case. *Id.* at 218–19. However, he stopped short of making such a finding and remitted the issue to this Court with further guidance quoted from the Comment to Section 548a of the *Restatement (Second) of Torts* (1977), including the following:

> Causation, in relation to losses incurred by reason of a misrepresentation, is a matter of the recipient's reliance in fact upon the misrepresentation.... Not all

losses that in fact result from the reliance are, however, legally caused by the representation. In general, the misrepresentation is a legal cause only of those pecuniary losses that are within the foreseeable risk of harm that it creates. . . . Pecuniary losses that could not reasonably be expected to result from the misrepresentation are, in general, not legally caused by it and are beyond the scope of the maker's liability.

*Id.* at 219. Gripping this "tow rope" as firmly as possible, and hopefully also grasping its full import, we have attempted to answer the question of foreseeabilty by making the accompanying Supplemental Findings of Fact, based upon our evaluation of the evidence adduced at the trial.

 With respect to plaintiffs' claim for negligent misrepresentation, the Court of Appeals found that there was a relationship approaching privity between E & Y and plaintiffs, so that E & Y owed plaintiffs a duty which was breached by E & Y's misrepresentations and remanded "so that the district court can determine whether the other elements of common law fraud are established." *Id.* at 222–23. As with a claim under Section 10(b) of the federal securities law, a claim for securities fraud under New York common law requires proof not only that the defendant's misrepresentation induced the plaintiff to enter into the transaction but also caused the plaintiff's loss thereon. In one of the shareholders' actions against E & Y likewise arising out of its certification of JWP's 1990 annual report, the Supreme Court of New York County stated:

> To prevail on their fraud claim, plaintiffs must show both that that they reasonably relied upon the misrepresentations contained in the financial statements and that such misrepresentations caused their losses. . . . Plaintiffs argue that for purposes of demonstrating loss causation, it is sufficient to demonstrate that the misrepresentations were a substantial factor in inducing [plaintiffs] to enter into the agreement [to exchange their stock for JWP stock]. This assertion is unpersuasive.

*Aronoff v. Ernst & Young,* No. 99–116731, 1999 WL 458779 at *3 (1999) (citations omitted). The *Aronoff* court recognized that loss causation requires foreseeability and concluded, as a matter of law, that there was no loss causation because the plaintiffs' loss "resulted from unforeseeable events" namely "the acquisition of Businessland, and the possible contributing factors of a slow construction market, and increased competition in the personal computer industry." *Id.*

Thus, all of the claims made by plaintiffs in this case, both state and federal, present the same issue: whether plaintiffs have proven that JWP's default on its note obligations to them was a reasonably foreseeable result of infirmities of JWP that were concealed by E & Y's misrepresentations.

## DISCUSSION

### Nature of the Fraud

As this Court stated in its original Findings of Fact and in the accompanying Opinion, JWP's annual reports for the years 1987 through 1991 contained many errors which, in combination, resulted in substantially overstating the company's assets and earnings. In its annual audits of JWP's books, E & Y discovered virtually all of these errors and, in its annual audit review with JWP's CFO, Ernest Grendi, attempted to convince him that the errors should be corrected. However, in virtually every case, Grendi was able either to persuade the auditors that no correction was necessary or to bully them into certifying the annual reports despite the errors. This Court found that these errors were material in that they were collectively of sufficient magnitude that a reasonable investor would consider them significant in making a decision whether to invest in the securities of JWP and that, in purchasing JWP's notes, plaintiffs had in fact relied on JWP's misleading annual reports and on the no-default letters which E & Y issued

annually pursuant to the Note Agreements. This Court also found that E & Y was aware that these discrepancies represented a departure from GAAP when it issued the no-default letters certifying that it was aware of no breaches of the Note Agreements, which included the obligation to maintain books and issue financial statements in conformity with GAAP. These findings fully support the conclusion that the following elements of a claim under Section 10(b) were established: falsity, materiality, scienter, reliance and damage. The only remaining element is proximate causation. The Court of Appeals, based on this Court's findings, has concluded that one of the two components of proximate causation—transaction causation—has been established. Thus the only component in question is loss causation—that is, whether E & Y could reasonably have foreseen that the financial infirmities concealed by the misleading annual reports which it certified and the no-default letters it issued could lead to JWP's default on the notes which plaintiffs purchased.

**Seriousness of the Accounting Irregularities**

A logical starting point is to determine what JWP's hidden infirmities were—that is, the magnitude of the discrepancies between JWP's assets and earnings, as shown by its certified annual reports, and its true financial condition. When, after exhaustive review by Deloitte & Touche, JWP's 1990 annual report (the last one issued before plaintiffs' final purchase of JWP's notes) was restated, pre-tax net income was reduced by about 11%, from $93 million to $83 million and after-tax net income by about 15%, from $59 million to $50 million. Supplemental Finding of Fact ("SFF") 6. There was no credible evidence of any accounting errors that were not corrected in that restatement. *Id.* There was no restatement of JWP's annual reports for any years prior to 1990. Although this Court found that some of the improper accounting practices had started in the earlier years, so that there was

"substantial overstatement of JWP's income in each of the years 1988 through 1990," 991 F.Supp. at 246, there was no reliable evidence which would permit computation of the precise amount of the overstatements in the years prior to 1990. SFF 7.

Plaintiffs' economics expert, Dr. Livingstone, attempted to make such a computation, but his methodology was seriously flawed. For example, he assumed that if a customer owed JWP a certain amount of money in an earlier year and a similar or larger amount in a later year, the account must have been of questionable collectibility and should have been discounted or written off altogether. He ignored the undisputed evidence that most of the accounts were dynamic, with earlier billings having being fully paid and replaced by later sales, sometimes completely rolling over several times during the period of his analysis. 991 F.Supp. at 244. However, even if Dr. Livingstone's inflated computation of the accounting errors were accepted in full and if JWP's reported income were reduced accordingly, JWP would still have been left with positive net income of $36 million in 1987, $26 million in 1988 and $37 million in 1989. SFF 7. Moreover, its true net income surely exceeded those figures. Since JWP's accounting abuses tended to increase over time, as success in deception emboldened JWP's "creative" accountants to ever brasher manipulation, it seems safe to assume that JWP's actual net income during the 1987–1989 period was, like its 1990 pre-tax net income, overstated by no more than 11%. With actual 1987–1990 income and cash flows at such levels, JWP would have had no difficulty whatever in meeting all of its obligations on plaintiffs' notes, SFF 2–4, and indeed did so through the end of 1992. Original Findings of Fact ("FF") 69. There is no reason to believe that it could not have continued to do so indefinitely had it not been for JWP's catastrophic acquisition of Businessland in the latter part of 1991.

### The Businessland Acquisition

On June 4, 1991, about two months after E & Y had issued its audit opinion on JWP's 1990 financial statements (the last audit opinion at issue here), JWP announced its intention to buy 51% of Businessland's common stock. The tender offer was successfully completed on August 2, 1991. FF 31. In exchange for the stock, JWP paid $36 million in cash (which it borrowed from banks), $38 million in common and preferred stock, and assumed $29 million in debt—a total consideration of $103 million. FF 33. But that was only the beginning of JWP's outlays. Businessland had been losing $10 million a month before the acquisition, and was on the verge of bankruptcy. FF 35. These losses continued without letup after the acquisition. FF 39.

JWP had entered the computer sales business only a year earlier, in May 1990, when it acquired NEECO and formed an Information Services ("I/S") Division around it. FF 34. But Businessland was, in terms of revenues, by far the largest acquisition JWP had ever attempted, roughly doubling the size of the I/S Division and making JWP the largest computer reseller in the United States. FF 31, 34. Businessland had been essentially a low-margin "box pusher" reselling computer hardware through retail stores. But JWP had a different vision for it: converting it into a higher-margin "value-added" systems integrator supplying to large corporate clients their full computer needs, including network installations, specialized software, instruction and servicing. 991 F.Supp. at 238. That conversion and the integration of Businessland into the I/S Division turned out to be much more difficult and costly than JWP had expected. FF 39–43. The I/S executives originally budgeted a cash drain of $32 million for the first quarter of 1992, then increased it to $57 million, and ultimately realized that if they could not persuade creditors and vendors to allow JWP to defer its pay-

ments to them, the cash drain could rise to $100 million for the quarter. FF 44.

Things turned out even worse than that, because of unforeseen developments in early 1992. Vicious competition in the personal computer industry—the so-called "PC price wars"—caused selling prices to go into "free fall," while the I/S Division's administrative and general expenses rose 70% and rapid-fire introduction of ever faster and more powerful computers obsoleted much of its existing inventory. FF 45, 47–52. These factors combined to cause the I/S Division to lose $201 million in 1992 alone. FF 45. This first-year loss was roughly double the total purchase price JWP had paid for the Businessland stock. As things turned out, what JWP really bought was a cash incinerator.

### The Recession in JWP's Mechanical and Electrical ("M & E") Business

To compound these troubles, the revenues of JWP's M & E division dropped precipitously in 1992 when the phenomenal commercial building boom which had begun in 1985 came to a screeching halt because overbuilding had produced record vacancy rates in office and commercial space. FF 54–55. On top of all this was the general downturn in the economy both in the United States and in the United Kingdom where JWP's M & E division did considerable business. FF 56–58. The confluence of all these factors resulted in a massive company-wide net loss of $612 million in 1992 and—of greater concern to long-term lenders—a *negative* cash flow of $49.6 million and a drop in JWP's equity cushion to *minus* $176 million. FF 67. The losses continued in 1993. FF. 68.

Even with practically all its cash being sucked away by such losses, JWP continued to pay interest in full on all of plaintiffs' notes through the end of 1992 and, under a standstill agreement with its creditors, made partial payments until April 1993 when the cashbox ran completely empty and JWP could borrow no more to replenish it. FF 69. After JWP defaulted on its debt obligations, holders of its con-

vertible subordinated debentures (not the present plaintiffs) filed an involuntary petition for its reorganization under the bankruptcy laws in December 1993. FF 77.

### E & Y's Role in JWP's Fraud

As this Court bluntly stated in its prior Opinion, E & Y failed to fulfill its responsibilities as auditor of the financial statements of a corporation whose securities are publicly traded. Its deficiency was not in its examination of JWP's books, which was sufficiently thorough to uncover virtually all of the accounting abuses which were found in the later exhaustive review by Deloitte & Touche, or which have been asserted by plaintiffs. Instead, E & Y's failure lay in the lack of determination or "spinelessness" demonstrated by its representatives when they met with Ernest Grendi for the annual review of audit differences and attempted to persuade him to correct the errors they had found. In almost all of these confrontations, the intransigent and intimidating Grendi won the argument and E & Y certified the misleading annual reports without change and without noting any exceptions. Such vertebral deliquescence was a dereliction of the duty which every auditor owes to the investing public. As this Court stated, "[t]he 'watch dog' behaved more like a lap dog." 991 F.Supp. at 247–48.

However, E & Y's substandard performance does not automatically render it liable to reimburse in full the loss of every investor in JWP's securities.

### The Investors' Losses

In presumed reliance on the picture of financial health portrayed by JWP's audited financial statements, thousands of persons bought shares of JWP's common stock. When JWP's President and Chief Operating Officer was replaced in early 1992 and rumors of JWP's financial problems began to spread, the market price of the stock went into a nosedive and dozens of shareholder class action suits were filed against the responsible executives of JWP and against E & Y. *Id.* at 239, 251. All these actions were consolidated in this Court and, after extensive discovery and lengthy negotiations, were ultimately settled, with E & Y contributing almost two-thirds ($23.4 million) of the settlement fund.

In such cases, where each investor has bought the company's stock within the class period and has later sold it, it is easy to compute the precise monetary loss he sustained by merely subtracting the amount he realized when he sold the stock from the amount he paid when he bought it. In the case of the notes involved here, which were purchased at par in private placements, where there was no established secondary market, and where plaintiffs planned to hold the notes to maturity as long-term investments, determining the loss, if any, attributable to defendant's fraud is not so simple. Under conventional damage principles, that loss would be the difference between the amount paid for the notes and their "true" value—the market value they would have had if JWP's true financial condition at the time of their purchase had been publicly known. Even if there had been a secondary market and a known market price for the notes, we still would have to estimate the effect on that price of a disclosure that JWP's financials were being restated downwardly. In the present case, that effect is difficult to assess because, at the time the notes were sold, even after correction of all the accounting errors, JWP's actual earnings, cash flow and equity cushion were more than sufficient to enable payment of all the interest and principal on the notes when due. SFF 4. There was no direct evidence as to how much lower, if any, the market value of the notes would have been if it had been publicly known that JWP's net earnings were some 11% less than reported, so long as its cash flow and equity cushion were more than adequate to cover all JWP's obligations on the notes to their maturity. E & Y's economics expert, Dr. Fischel, testified that, in his opinion, such a minor correction of JWP's reported earnings would not have appreciably af-

fected the market value of its notes. SFF 36.

The record undisputedly shows that plaintiffs ultimately lost roughly $100 million on their investment in the notes. But, under established tort law as recognized by all three opinions of the Court of Appeals, E & Y is not liable for those losses unless they were a reasonably foreseeable result of E & Y's misrepresentations. What then should E & Y have foreseen when it knowingly certified JWP's overstated annual reports and issued its false no-default letters?

### Foreseeability

■ Hindsight is always 20/20. Once a result is known, along with all the intervening events which caused it, it is all but humanly impossible to put that knowledge out of mind when determining whether those occurrences could reasonably have been anticipated. But the present inquiry demands that we strive as scrupulously as possible to view the situation as it existed at the time of E & Y's certifications, with the knowledge E & Y then had, and without the knowledge we now have of what actually happened thereafter.

E & Y surely knew that investors would rely on the inflated financial statements it certified. E & Y should also have anticipated that eventually the distortions would be exposed, causing a drop in the market price of JWP's common stock, with a substantial loss to its shareholders. When those things happened, those who had lost money by buying JWP's shares in reliance on the misleading statements sought reimbursement by bringing fraud actions against E & Y along with the responsible officials of JWP. When the individual defendants and their D & O insurance carriers could make only partial restitution of the shareholders' losses, E & Y contributed the lion's share of the settlement fund. E & Y thus implicitly recognized the merit in the shareholders' claims that their losses were a foreseeable result of its deceptions, and it paid a punishing penalty therefor.

The losses sustained by the noteholders are a different matter. There the critical issue is whether E & Y could reasonably have foreseen in early 1991, when it certified JWP's 1990 annual report and issued its annual no-default letter, that JWP would default in the payment of interest or principal on the notes which plaintiffs purchased.

At that time, E & Y knew that JWP's *actual* net earnings, cash flows and equity cushion were all substantial and had been growing steadily for a number of years. They were sufficient to cover all JWP's obligations on the notes with a considerable margin of safety. The evidence showed nothing that should have forewarned E & Y of the disasters to come.

True, E & Y knew that the annual reports it certified painted a rosier picture of JWP's prosperity than the facts justified. But there was no reason for E & Y to foresee that such gilding of the financial lily would lead to JWP's default on the notes. E & Y was also well aware that JWP's history was one of rapid expansion through corporate acquisitions. But, although that expansion had been aggressive in terms of the rate of growth, it was conservative in terms of the quality of the companies acquired. FF 28. E & Y could not possibly have anticipated that within a few months JWP would make the largest acquisition it had ever made; that the company acquired would be one which was losing money at a staggering rate and was on the verge of bankruptcy; that the company's business would soon be hit by a devastating price war; that the integration of the new subsidiary into JWP's I/S Division would be made more difficult by a mass exodus of key executives and the unexpectedly high cost of establishing new offices and canceling existing store leases; and that a sharp drop in commercial construction would hit JWP's M & E business. FF 40–43.

### Lessened Risk Aversion

As previously noted, in his dissenting opinion on appeal, Chief Judge Winter ex-

pressed the view that JWP's executives, knowing that the company was less healthy than they had represented in the published financial statements, were tempted "to seek salvation in a risky deal" and make a quick profit to close the gap before discovery of the fraud. But there is no evidence that JWP's management believed that the company was in a "precarious financial position" or that desperation gambles were a needed cure. SFF 14. They had many reasons to believe the opposite: that their acquisition strategy was a success, that the company was strong and steadily getting stronger. SFF 2–4.

Moreover, JWP's executives did not view the Businessland acquisition as a long-shot bet, but as a rare business opportunity. After all, they were getting Businessland's stock at a deeply distressed price, and they saw in its corps of trained technical personnel and its large clientele of Fortune 1000 companies the prefabricated foundation for a successful computer sales and service organization. SFF 9. Even the plaintiffs who knew of the proposed Businessland acquisition thought it made "a lot of sense." SFF 10. No one saw it as a wild, "bet-the-company" gamble.

### Concealment of the Lack of Integrity

Chief Judge Winter also suggested that a reasonable lender would have "discounted JWP's creditworthiness not only because of its less favorable financial condition but also, far more devastatingly, because of the questionable quality of its management and auditor." 206 F.3d at 230. It is surely true that an investor is less likely to buy a corporation's notes without confidence in the integrity of the company's executives and of the auditors who validate its financial statements. But this is a matter of transaction causation, not loss causation. The appropriate question here is whether the concealed lack of integrity was a foreseeable cause of plaintiffs' loss.

The evidence does not show that it was. True, this Court and the Court of Appeals have found that those responsible for preparing JWP's financial statements, Ernest Grendi in particular, distorted those statements with fraudulent intent and that E & Y furthered the fraud by certifying the statements with knowledge of their inaccuracy. But, as already discussed, even without this inflation of its earnings and assets, JWP had, at the end of 1990, more than sufficient cash flow and equity cushion to discharge all its obligations on plaintiffs' notes to maturity. Thus JWP's default was not caused by the lack of integrity *per se*. Ernest Grendi may have been a crook, but he was a competent crook whose company prospered and grew and paid all its debts until the disasters that struck in 1992.

This of course leaves the question whether E & Y's *concealment* of the lack of integrity of JWP's executives was a foreseeable cause of plaintiffs' loss. This question cannot be answered by hard proof, but requires us to speculate what would have happened if E & Y had refused to certify JWP's annual reports without correction. It is difficult to imagine that Ernest Grendi would have refused to revise JWP's financial statements as E & Y suggested, if he had known that otherwise E & Y would not certify the statements or would certify them only with a number of noted exceptions. SFF 37. The revisions E & Y wanted would have reduced JWP's reported net income by such a minor percentage that it would have scarcely diminished the attractiveness of JWP's notes to purchasers—an impact much less serious than that which would likely result from several pages of auditor's exceptions appended to the financial statements. *Id.*

Moreover, in the highly unlikely event that Grendi did defy an ultimatum from E & Y and refuse to make the revisions it demanded, all E & Y had the professional responsibility to do was to decline to certify the statements or to certify them with exceptions. SFF 13. Generally accepted

auditing standards ("GAAS") do not require E & Y to go still further and expressly warn potential investors to beware of the low moral character or fraudulent designs of the company's executives. *Id.*

On the other hand, if Grendi had yielded to a demand from E & Y and issued amended financial statements for 1987–1990, there is no reason to expect that plaintiffs would have exercised the option to declare a default and accelerate their notes. They had bought the notes as long-term investments which they intended to hold to maturity. SFF 28. Since the amended statements would still show that JWP have had more than ample ability to discharge all its obligations to plaintiffs, their interests would obviously be better served by sitting tight on what was still a good investment, rather than sounding an alarm and possibly starting a "run on the bank" which could threaten JWP's ability to pay them off. SFF 29. Moreover, such a minor restatement of JWP's financials at the behest of its auditors might give its investors more rather than less confidence in the integrity of JWP's accounting and in the safety of their investments.

For these reasons, this Court cannot find that plaintiffs' loss was a foreseeable result of E & Y's certification of JWP's annual reports without qualification and without public criticism of the integrity of its management.

### The Policy Underlying the Securities Laws

As previously noted, in his opinion on appeal, Judge Oakes counseled this Court to be mindful of the "underlying policy of the securities laws involved and the climate of securities regulation as it has evolved and as it currently exists." 206 F.3d at 218. Leaving nothing to chance, Judge Oakes analyzed these factors at length, emphasizing that the Securities Acts of 1933 and 1934 were designed to promote investor confidence by requiring companies whose securities are publicly traded to issue full and accurate financial reports. Of course, to be credible, these reports must be validated by a reputable public accounting firm.

The enforcement of these requirements is not left to the SEC alone. Courts have universally recognized an implied right of private action by investors. If a company's financial reports are intentionally falsified in any material respect, and if an investor buys the company's securities in reliance on the false reports, the company and its responsible executives are liable for any loss by the investor which was a reasonably foreseeable consequence of the fraud. Likewise, if the company's auditors certified the reports knowing they were materially false, they are equally liable as joint tortfeasors. This exposure to personal liability is a powerful deterrent against securities fraud.

For its complicity in JWP's fraud, E & Y has already paid $23.4 million to settle the claims of the shareholders whose stock plummeted in market price following disclosure of the company's problems. That amount is almost a hundred times E & Y's annual fee for auditing JWP's books. *See* FF 269. This is without including E & Y's litigation expenses in the multiple actions against it arising out of the JWP audits, which must add millions more to E & Y's total costs. Even if plaintiffs recover nothing in this action, E & Y's experience at JWP will have been an extravagantly expensive education in auditing ethics. On top of those punitive tuition fees, there is the public humiliation of having been judicially scolded for conduct unbecoming an auditor. That is surely enough to make any public accountant meticulously careful in its certifications of the financial statements of publicly held corporations.

If E & Y is now ordered to reimburse plaintiffs for their entire losses on notes which were unpaid, not because of financial weaknesses which were concealed by misleading financial statements, but because of post-audit developments that could not reasonably have been foreseen, E & Y will effectively have been made the guarantor

of plaintiffs' investments. Plaintiffs did not pay the premium for any such insurance. True, they thought they were buying investment-grade securities, but they knew that JWP's notes involved appreciable risk, which is the reason JWP had to pay interest of up to 10.75% on the notes, FF 360–72, far above the rate obtainable on "riskless" government obligations at the time. Plaintiffs surely expected to assume the risk that a general economic recession might adversely affect JWP's ability to discharge its obligations on the notes. They must also accept the hazard that JWP's executives might make a bad business decision unless, of course, such a decision was a reasonably foreseeable result of deliberately concealed defects in JWP's management structure or the competence and character of its executives.

If public accounting firms are required to make good the loss of every investor in the securities of the companies whose books they audit, losses which may amount to many hundreds of times the fees they charge, even when the losses are caused by unforeseeable post-audit events, including economic recessions and bad management decisions, few if any accounting firms would be so reckless as to certify the financial statements of a publicly held company. Because the securities markets depend upon the reliability of financial statements, which in turn depends on the availability of competent and conscientious auditors, public policy requires that auditors be held liable for only those losses which foreseeably result from their deliberate deception or reckless insouciance.

The Supreme Court weighed similar policy considerations in deciding that Section 10(b) and Rule 10b–5 do not apply to those who merely aid and abet securities fraud:

> Extending the 10b–5 cause of action to aiders and abettors no doubt makes the civil remedy more far reaching, but it does not follow that the objectives of the statute are better served. Secondary liability for aiders and abettors exacts costs that may disserve the goals of fair dealing and efficiency in the securities markets.... Because of the uncertainty of the governing rules, entities subject to secondary liability as aiders and abettors may find it prudent and necessary, as a business judgment, to abandon substantial defenses and to pay substantial judgments in order to avoid the expense and risk of going to trial.... This uncertainty and excessive litigation can have ripple effects. For example, newer and smaller companies may find it difficult to obtain advice from professionals. A professional may fear that a newer or smaller company may not survive and that business failure would generate securities litigation against the professional among others. In addition, the litigation and settlement costs under 10b–5 may be passed on to their client companies, and in turn incurred by the company's investors, the intended beneficiaries of the statute. See Winter, Paying Lawyers, Empowering Prosecutors, and Protecting Managers: Raising the Cost of Capital in America, 42 Duke L.J. 945, 948–966 (1993).

*Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N. A.,* 511 U.S. 164, 188–89, 114 S.Ct. 1439, 128 L.Ed.2d 119 (1994) (most citations omitted).

### Plaintiffs' Contention that the Businessland Acquisition Violated the Note Agreements

Plaintiffs contend that the merger between Businessland and a subsidiary of JWP violated a provision of the Note Agreements (e.g., PX 134A, ¶ 6G(b)(2)(i)) that prevents a restricted subsidiary of JWP from merging with any outside corporation if JWP was in default of any covenant of the Note Agreements at the time of the merger or within the preceding 90 days. Since one covenant of the Note Agreements required that JWP's books be kept in accordance with GAAP, a covenant which this Court has found to have been violated, plaintiffs argue that the Businessland acquisition was forbidden by the Note

Agreements and would not have happened if E & Y had not concealed JWP's violation of GAAP.

E & Y responds that the Businessland acquisition did not violate the Note Agreements because the acquisition was in two stages, each of which was permissible even if JWP was in default of the Note Agreements. It contends that Stage 1, the purchase of 51% of the shares of Businessland, was an "investment" specifically permitted by the Note Agreements (e.g., PX 134A, pp. 39–40) and that Stage 2, the takeout of the minority stockholders of Businessland by exhanging JWP shares for their Businessland shares and the merger of Businessland into JWP's I/S Division, was also expressly permitted (e.g., PX 134A, ¶ 6G(c)). Plaintiffs counter that it is a violation of the intent of the Note Agreements to break the transaction down into two stages, as E & Y argues should be done, because from the outset a full merger, including both stages, was contemplated.

The Note Agreements do not unambiguously confirm the contract construction urged by either side. Parol evidence would therefore have been admissible to determine the intent of the contracting parties. However, there was no occasion for the introduction of such evidence at the trial because plaintiffs did not allege anywhere in their detailed 86–page complaint that the Businessland acquisition was a violation of the Note Agreements. Neither did they introduce at trial any evidence concerning the intent of the contract provisions in question, nor make any such argument in their post-trial briefs. It was first suggested in one of several hundred Supplemental Proposed Findings, which was plaintiffs' final post-trial submission, to which E & Y did not have the right to reply.

It would be grossly unfair to permit that contention to be raised now and deprive E & Y of the opportunity to introduce evidence bearing on the issue, and we therefore rule that this contention has been waived. In this ruling, we are reinforced by the belief that the issue is not a winning one for plaintiffs in any event. The fact is that JWP *did* proceed with the Businessland acquisition, despite being in default of the Note Agreements' covenant to keep its books in accordance with GAAP. If E & Y could not persuade Ernest Grendi to fulfill JWP's obligation under the Note Agreements by keeping an honest set of books, there is no reason to believe it could have persuaded him to abstain from the biggest business deal of his life just because those same Note Agreements provided that JWP could not enter into a merger while it was in violation of GAAP. Moreover, if the merger was indeed a violation of the Note Agreements, that should have made it all the more unforeseeable by E & Y.

## CONCLUSION

Our review of the evidence in this case has led inexorably to the same conclusion: that if it had not been for JWP's acquisition of Businessland and the crushing financial burden that it imposed, JWP would have paid all of the interest and principal due on plaintiffs' notes. When E & Y certified JWP's 1990 financials, it could not possibly have foreseen such an acquisition. E & Y did know that JWP was dressing up its financials to inflate its reported net income by a minor percentage. But it also knew that under that frosting there was a lot of cake, and that there was no real threat that JWP would be unable to discharge all its debt obligations. JWP's acquisition strategy had gone well. The company was strong and steadily getting stronger. Its executives had no reason to splurge in high-risk gambles to rescue a failing company or hide their accounting manipulations. They proudly viewed JWP as a real success story. They obviously thought they had gotten away with their deceptions and did not expect that they would ever be exposed. There were no portents that could have forewarned E & Y of the possibility that within the year JWP would make by far its largest acquisi-

tion ever; that the acquired company would be a financial basket case; that the acquisition would cause a cash hemorrhage, which would be exacerbated by a price war; and that JWP would be unable to supply the transfusion of cash necessary to keep the company alive because of a recession in commercial construction. To find that E & Y should have foreseen any such compound catastrophe, rivaling the woes of Job, merely because JWP had stretched its reported earnings by 11% and had thereby become less risk averse, would be to charge auditors with a power of precognition not possessed by other mortals.

Without allowing hindsight to dominate our determination of predictability, we are compelled to find that plaintiffs' loss on their investments in JWP's notes was not a foreseeable result of E & Y's complicity in JWP's misrepresentations but of post-audit developments that could not have been anticipated.

For the reasons stated, plaintiffs' complaint is dismissed in all respects with prejudice.

So Ordered.